AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), and 1752(a)(1) – (4), and 40 U.S.C. § 5104 (e)(2)

)
)
)
)
)
)
)

Case No.  21-SC-1386

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____Northern District of California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

8 U.S.C. § 111(a)(1) - Assaulting, Resisting, or Impeding Certain Officers ; 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder; 18 U.S.C. § 1512(c)(2) - Obstruction of official proceeding; 18 U.S.C. §§ 1752(a)(1)-(4) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. § 5104(e)(2) - Violent Entry and Disorderly Conduct on Capitol Grounds.

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kenneth R. Shappee, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means)*.

Date:  _____4/29/2021_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

G. Michael Harvey
United States Magistrate Judge

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT | ) |
| PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 | ) |
| U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ | ) |
| 111(a)(1), 231(a)(3), 1512(c)(2), and 1752(a)(1) – (4), and 40 U.S.C. § 5104 | ) |
| (e)(2) | |

Case No.  21-SC-1386

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern District of California _____.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 13, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____ 4/29/2021 _____          _____

*Judge's signature*

City and state: _____ Washington, D.C. _____          _____ G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-1386 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with Instagram account bugziethedon (active on, but not limited to, January 6, 2021), that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

## <u>ATTACHMENT B</u>

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Facebook, Inc. ("PROVIDER") to facilitate
      execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f) (reference case number **5726788**), PROVIDER is required to disclose the following

information to the government corresponding to each account or identifier ("Account") listed in

Attachment A:

   a.   For the time period **January 1 to 15, 2021**:  The contents of any available messages

        or other communication associated with the Account (including, but not limited to,

        messages, attachments, draft messages, posts, chats, video calling history, "friend"

        requests, discussions, recordings, images, or communications of any kind sent to and

        from the Account, including stored or preserved copies thereof) and related

        transactional records for all PROVIDER services used by an Account subscriber/user,

        including the source and destination addresses and all Internet Protocol ("IP")

        addresses associated with each message or other communication, the date and time at

        which each message or other communication was sent, and the size and length of

        each message or other communication;

   b.   For the time period **January 1 to 15, 2021**:  All photos and videos uploaded by the

        Account and all photos or videos uploaded in which the Account has been "tagged,"

including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.  For the time period from **account creation to present**:  Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.  For the time period **January 1 to 15, 2021**:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the

2

Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e. For the time period **January 5 to 7, 2021**:  All "check ins" and other location information;

f. For the time period **January 1 to 15, 2021**:  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g. For the time period **account creation to present**:  All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

h. For the time period **January 5 to 7, 2021**:  All information held by PROVIDER related to the location and location history of the user(s) of the Account, including

3

geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

i.   For the time period **January 1 to 15, 2021**:  All information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within **14 days** of the issuance of this warrant, PROVIDER shall deliver the information set forth above via Facebook law enforcement portal to **Michael C. Liebman, Assistant U.S. Attorney, 555 4th Street, N.W., Washington, D.C. (michael.liebman@usdoj.gov), and/or Kenneth R. Shappee, FBI Special Agent, 601 4th Street, N.W., Washington, D.C. (krshappee@fbi.gov)**.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), and 1752(a)(1) – (4), and 40 U.S.C. § 5104(e)(2),  as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in committing the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)  Information that constitutes evidence concerning assaults on law enforcement personnel in and around the Capitol on January 6, 2021; interference with law enforcement personnel during a civil disturbance in and around the Capitol on January 6, 2021; acts on January 6, 2021 to obstruct a congressional proceeding;

5

and unlawful entry, disorderly and violent conduct, and unlawful demonstrations

in and around the Capitol on January 6, 2021.

**III.      Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the

PROVIDER and determine which information is within the scope of the information to be seized

specified in Section II.  That information that is within the scope of Section II may be copied and

retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does

not fall within the scope of Section II and will not further review the information absent an order

of the Court. Such sealed information may include retaining a digital copy of all information

received pursuant to the warrant to be used for authentication at trial, as needed.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), and 1752(a)(1) – (4), and 40 U.S.C. § 5104(e)(2)** | **SC No. 21-SC-1386** |

*Reference:*     *USAO Ref. # 2021R00344; Subject Account:  bugziethedon (Instagram)*

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Kenneth R. Shappee, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation.  I have been in this position since 2002.  I am currently assigned to the International Corruption Unit of the FBI's Washington Field Office and during my career I have received both formal and informal training from the FBI and other institutions regarding computer-related investigations and computer technology.  I have sworn to search warrant applications and conducted or participated in the execution of search warrants including searches of premises and electronic devices found therein.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ §§ 111(a)(1), 231(a)(3), 1512(c)(2), and 1752(a)(1) – (4), and 40 U.S.C. § 5104(e)(2) have been committed by Antionne Deshaun Brodnax and others.  There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

4.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

5.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C.  20510, at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the

west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

7.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the

3

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

12.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as

4

others in the crowd encouraged and assisted those acts.  Publicly available video footage shows

an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking

take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



16.    Shortly thereafter, at approximately 2:20 p.m. members of the United States

House of Representatives and United States Senate, including the President of the Senate, Vice

President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about

this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and

locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects

attempted to break into the House chamber, by breaking the windows on the chamber door, law

enforcement were forced to draw their weapons to protect the victims sheltering inside.

17.    At approximately 2:30 p.m. EST, known and unknown subjects broke windows

and pushed past USCP and supporting law enforcement officers forcing their way into the U.S.

Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

20.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.     An unknown subject left a note on the podium on the floor of the Senate

Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is

Coming."



23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





24.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

26.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

27.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

28.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized

10

occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

29.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

30.     Beginning around 9:00 p.m., the House resumed work on the Certification.

31.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

32.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

33.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

34.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the

U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

35.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



[1]https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup





---

[2]https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

### *Facts Specific to This Application*

36.     On January 6, 2021, a Twitter and Instagram user going by the name "@Bugziethedon" and "Bugziethedon" was referenced in images from various Twitter account users.  One example was on "@Homegrownterrorists" Twitter feed, which showed a screen recording of CNN's livestream from January 6, 2021, and which depicted an individual that was referenced to as @Bugziethedon.  The screen image below shows the individual referenced as @Bugziethedon.

14



37.    Review of CNN's videos noted the individual below.



a

38.    Open source searches also uncovered now-deleted social media from @bugziethedon/bugziethedon, which were reposted by other social media users, that showed the individual associated with @bugziethedon/bugziethedon walking around inside the United States Capitol Building.  One such post, shown below, depicted @bugziethedon/bugziethedon sitting on the statue of Norman Borlaug in the United States Capitol Building's Statuary Hall.



39.    Other posts of the same subject, in front of and inside the Capitol on January 6, were also provided to the FBI by tipsters.  Those posts appear below.





40.     In the post immediately above, it should be noted that the vehicle the subject is sitting on is a U.S. Capitol Police SWAT truck.

41.     Database searches of information associated with @bugziethedon's / bugziethedon's social media accounts noted the individual Antionne DeShaun BRODNAX ("BRODNAX") appeared to be the social media user @bugziethedon/bugziethedon.

42.     BRODNAX was interviewed by FBI agents on January 15, 2021.  During the interview he identified himself by date of birth and social security number, and admitted to the agents that he entered the U.S. Capitol Building on January 6, 2021.  BRODNAX also provided the following additional information.  BRODNAX said he had traveled to Washington, D.C., prior to January 6, 2021, to shoot a music video.  On January 6, 2021, BRODNAX saw a rally of which many participants descended on the U.S. Capitol Building.  BRODNAX followed the crowd to the United States Capitol Building and entered the building after United States Capitol

18

Police (USCP) moved the gates that blockaded the door.  BRODNAX entered the United States

Capitol Building peacefully.  Once inside the United States Capitol Building BRODNAX walked

around and took pictures and videos of the architecture.  BRODNAX did not know the name of

the rooms that BRODNAX entered while inside the United States Capitol Building.  BRODNAX

did not enter any office, nor chambers, and did not engage in violence nor theft.  BRODNAX

described his immediate vicinity in the United States Capitol Building as nonviolent.

BRODNAX said that while BRODNAX was inside the United States Capitol Building

BRODNAX received notice from friends on his social media accounts that the image of

BRODNAX inside the United States Capitol Building was broadcast in a videoclip on CNN.

BRODNAX said he left the United States Capitol Building after approximately forty minutes.

43.     Your affiant has also obtained video footage, recorded on January 6, 2021, from a

U.S. Capitol Police camera inside the Capitol Building that corresponds to the CNN video

footage and the above image from @bugziethedon.  This footage, like the CNN footage, shows

BRODNAX walking between the rope-lines, but then also shows him stepping out from the

rope-line area and walking over toward a statue, where it appears he asks a woman to take his

photograph.

44.     Your affiant has also reviewed additional USCP camera footage recorded on

January 6, 2021, from 2:28 p.m. to 2:36 p.m., that also shows BRODNAX.  In this footage,

which covers an area of the Capitol known as the Statuary Hall connector, and which does not

have audio, BRODNAX is among a crowd of persons unlawfully in the Capitol who are

proceeding down a hallway but are blocked from going further by a police officer.  A still from

the footage, taken at 2:28:49 p.m. appears below, with BRODNAX, the police officer, and one

particular angry unidentified woman indicated.

19



45.     Your affiant has also reviewed social media footage apparently recorded by a member of the crowd--most likely the man a few feet to the left of the unidentified angry woman who in the still above appears to be holding a cell phone in his right hand above his head--that corresponds to the first several moments of the USCP Statuary Hall connector camera footage. In the social media footage, which includes audio, the unidentified angry woman shouts:  "Tell

Pelosi we're coming for that bitch.  Tell fucking Pelosi we're coming for her.  Fucking traitor, c**t."  A still from the social media footage appears below.



46.     As the USCP video progresses, more people join the crowd, more police officers move in to attempt to restrain them, and BRODNAX makes his way toward the front, all as indicated in the still below, which is taken at 2:36:07 p.m.



47.     About a minute later, the USCP footage shows the crowd, including BRODNAX, surging past the police line, as indicated in the still below.



48.     Additional social media footage, apparently recorded shortly thereafter, shows

BRODNAX among the crowd, which is chanting, "Stop the steal!", and "Break it down!" (in

apparent reference to the doorway in the background.)  At various points in this footage,

BRODNAX is holding up his cell phone apparently recording the scene, as shown in the stills below.





49.     On January 11, 2021, PROVIDER was served with a preservation letter under 18

U.S.C. § 2703(f) related to the account **bugziethedon (reference number 5726788).**

50.     On February 2, 2021, an arrest warrant was issued for BRODNAX relating to

violations of 18 U.S.C. § 1752(d) and 40 U.S.C. § 5104(e) occurring on or about January 6,

2021, in Washington, D.C.

### BACKGROUND CONCERNING INSTAGRAM[4]

51.     Instagram is a service owned by Facebook, a United States company and a

provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.

---

[4]The information in this section is based on information published by Facebook on its website and its
Instagram website, including, but not limited to, the following webpages:  "Data Policy,"
https://help.instagram.com/519522125107875; "Information for Law Enforcement,"
https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

Specifically, Instagram is a free-access social networking service, accessible through its website

and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the

target account(s) listed in Attachment A, through which users can share messages, multimedia,

and other information with other Instagram users and the general public.

52.     Facebook collects basic contact and personal identifying information from users

during the Instagram registration process.  This information, which can later be changed by the

user, may include the user's full name, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, credit card or bank account

number, and other personal identifiers.  Facebook keeps records of changes made to this

information.

53.     Facebook also collects and retains information about how each user accesses and

uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to

create and use an account, unique identifiers and other information about devices and web

browsers used to access an account, and session times and durations.

54.     Each Instagram account is identified by a unique username chosen by the user.

Users can change their usernames whenever they choose but no two users can have the same

usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the

primary account, can switch between the associated accounts on a device without having to

repeatedly log-in and log-out.

55.     Instagram users can also connect their Instagram and Facebook accounts to utilize

certain cross-platform features, and multiple Instagram accounts can be connected to a single

Facebook account.  Instagram accounts can also be connected to certain third-party websites and

mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image

26

uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Facebook maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

56.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

57.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users.  Facebook retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Facebook to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

58.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

59.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on

27

their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

60.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

61.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

62.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

63.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or

twice, depending on settings.  Senders can't view their disappearing messages after they are sent

but do have access to each message's status, which indicates whether it was delivered, opened, or

replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat

with each other directly or in groups.

64.     Instagram offers services such as Instagram Checkout and Facebook Pay for users

to make purchases, donate money, and conduct other financial transactions within the Instagram

platform as well as on Facebook and other associated websites and apps.  Instagram collects and

retains payment information, billing records, and transactional and other information when these

services are utilized.

65.     Instagram has a search function which allows users to search for accounts by

username, user activity by location, and user activity by hashtag.  Hashtags, which are topical

words or phrases preceded by a hash sign (#), can be added to posts to make them more easily

searchable and can be "followed" to generate related updates from Instagram.  Facebook retains

records of a user's search history and followed hashtags.

66.     Facebook collects and retains location information relating to the use of an

Instagram account, including user-entered location tags and location information used by

Facebook to personalize and target advertisements.

67.     Facebook uses information it gathers from its platforms and other sources about

the demographics, interests, actions, and connections of its users to select and personalize ads,

offers, and other sponsored content.  Facebook maintains related records for Instagram users,

including information about their perceived ad topic preferences, interactions with ads, and

advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

68.     In some cases, Instagram users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

69.     For each Instagram user, Facebook collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

70.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

71.     For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation.  Based on my training and experience, [[instant messages, emails, voicemails, photos, videos, and documents]] are

often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

72.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Facebook can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

73.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

74.     Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, the [[ ]] may reveal [[services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators]]. In addition, [[emails, instant messages, Internet activity, documents, and contact and calendar information]]

can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

75.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

76.     Therefore, Facebook's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my

training and experience, such information may constitute evidence of the crimes under

investigation including information that can be used to identify the account's user or users.

### REQUEST TO SUBMIT WARRANT BY TELEPHONEOR OTHER RELIABLE ELECTRONIC MEANS

77.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Search Warrant.  I submit that Assistant U.S. Attorney

Michael Liebman, an attorney for the United States, is capable of identifying my voice and

telephone number for the Court.

### CONCLUSION

78.     Based on the forgoing, I request that the Court issue the proposed search warrant.

79.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving the warrant on Facebook.  Because the warrant will be served on Facebook, who will

then compile the requested records at a time convenient to it, reasonable cause exists to permit

the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Kenneth R. Shappee
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 29, 2021.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

33